UNITED STATES of America, Plaintiff,

v.

Shaun Jerome SMALL, Defendant.

No. CR 86–1112 RFP.

United States District Court,
N.D. California.

July 14, 1987.

Joseph P. Russoniello, U.S. Atty., Joel R. Levin, John D. Lyons, Asst. U.S. Attys., San Francisco, Cal., for plaintiff.

Harold J. Rosenthal, Riordan & Rosenthal, Karen Snell, San Francisco, Cal., for defendant.

## MEMORANDUM AND ORDER DENYING MOTION TO SUPPRESS EVIDENCE

PECKHAM, Chief Judge.

### INTRODUCTION

The defendant Shaun Jerome Small moves to suppress all evidence obtained in searches conducted of his person, his automobile, 2225 Gough Street, 610 Clipper Street and 1424 36th Avenue in San Francisco, and a modular home in Clearlake, California. Small also moves to suppress his statements to FBI agents on the day of his arrest. The court denies the motion to suppress in its entirety.

### BACKGROUND

On November 17, 1986, at approximately 2:55 p.m., an explosive device concealed in a bouquet of flowers detonated in the General Services Administration ("GSA") building in San Francisco. The explosion injured a GSA employee, Melanie Pilaski, and her co-worker Pamela Castro. After the explosion, FBI agents visited the scene and began an investigation, including interviews of various witnesses and collection of physical evidence. The investigation revealed that the flowers had been delivered by a delivery man dressed in a white bellhop suit. The FBI also learned that, at approximately 4:15 p.m. on the same afternoon, a man dressed in a white bellhop's suit had attempted to deliver a basket of flowers to Melanie Pilaski's father, Willard Swanstrom.

At approximately 11:00 p.m. on November 17, 1986, Special Agent Patrick Webb telephoned United States Magistrate Claudia Wilken and applied for oral search warrants for the residence of Melanie Pilaski's husband Peter Pilaski (2225 Gough Street), the residence of the defendant Shaun Small

(610 Clipper Street, Apartment 1), and the person of Shaun Small. The Magistrate authorized warrants to search for the following items:

> tools to include side cutters, bench vise, solder, solder flux and a soldering iron. Material to include black plastic pipe, plastic pipe caps, pvc cement, batteries, wire, rocket ignitors, duct tape, other tapes, wicker baskets, clear and colored plastic wrap, magnets, glass marbles, magnets, reed switches, dried flowers, glue, reloading gun powders, greeting cards, a small silver box, silver gift wrap ribbon and blue ink writing pens. Also, any diagrams, instructional manuals, correspondence, notes, maps, diaries, gloves, receipts from hardware or electronics stores, receipts for reloading gun powders, improvised explosive devices, snap top electrical connectors and wood pressed fiber board.

On the night of November 17–18, after Magistrate Wilken issued the oral warrant, FBI agents conducted searches of the two residences. At the Clipper Street residence, the agents found Roman candle rockets, fire crackers, shotgun shells, electrical wire, red plastic tape and a battery. At the Gough Street residence, the agents found PVC pipe, silver duct tape, copper insulated wire, plastic magnetic switches and snap connectors.

On November 18, 1986, law enforcement officers arrested Shaun Small at a modular home owned by the Pilaskis in Clearlake, California. Small was taken to the Sheriff's substation at Clearlake, where he gave a statement to three FBI agents. After the interview, the agents conducted a search of the Pilaski residence in Clearlake, as well as Shaun Small's automobile.

On December 6, 1986, two additional search warrants were executed at the Gough Street and Clipper Street residences, and a third warrant was executed at another residence of Peter Pilaski located at 1424 36th Avenue in San Francisco. These warrants permitted the agents to seize, among other things, typing paper, GSA envelopes, "Pyramid" brand paper and handwritten notes or typewritten

drafts of letters to A.J. Kramer or Willard Swanstrom. During the course of the December 6 search of Small's Clipper Street residence, the agents seized a shipping invoice bearing Shaun Small's name and the words "pyrotechnics" and "chemical powder and explosives."

The defendant now seeks to suppress all evidence seized in the course of all of these searches, as well as the statements made by him to law enforcement officers at the time of his arrest. On April 6, April 20, May 29 and June 3, 1987, the court held an evidentiary hearing on the following issues: (1) whether the defendant freely and voluntarily consented to the December 6 search of the Clearlake residence and of his automobile; (2) whether the defendant freely and voluntarily waived his *Miranda* rights; and (3) whether the shipping invoice was properly seized pursuant to the "plain view" doctrine. The court now issues this memorandum and order addressing all of the issues raised by the defendant.

### DISCUSSION

#### 1. Standing to Contest Searches

As a threshold matter, the court must determine whether the defendant has standing to challenge the searches. In order to challenge the legality of a search, a defendant must establish that he has a "legitimate expectation of privacy" in the place searched or the property seized. *See United States v. Kovac,* 795 F.2d 1509, 1510 (9th Cir.1986). "The defendant has the burden of establishing that, under the totality of circumstances, the search or seizure violated his legitimate expectation of privacy in a particular place." *Id.*

■ The government argues that the defendant has failed to satisfy his burden of establishing that he had any expectation of privacy in the Gough Street, 36th Avenue or Clearlake residences. Although it is true that the defendant did not own or reside permanently in any of these residences, his declaration nonetheless supports a finding that he had a reasonable expectation of privacy in each of the searched homes. According to the declara-

tion, Small was a frequent guest at both San Francisco residences, possessed keys to both San Francisco residences, had permission to enter them whenever he wanted, visited them regularly, kept personal possessions in them, spent nights in them, and had complete access to them. *See* Decl. of Shaun Jerome Small at 1–2 (filed April 1, 1987). Furthermore, the declaration also states that Small was in possession and control of the Clearlake residence at the time of his arrests, that he had keys to the residence, that he was the sole occupant at the time, and that he was responsible for the premises. These facts are sufficient to establish a reasonable expectation of privacy in each of the residences.

■ The government further contends that the defendant could not have had a reasonable expectation of privacy during the second search of his Clipper Street residence because he was in custody at the time and no longer resided there. However, as the defendant points out, his rental period in the Clipper Street apartment had not lapsed, and some of his personal belongings were still in the apartment at the time of the search. Thus, the defendant still had a reasonable expectation of privacy, and he has standing to challenge the legality of the search.

### 2. The Necessity for a Franks Evidentiary Hearing

The defendant contends that the affidavit of Special Agent Webb in support of the first set of warrants contained intentionally or recklessly false statements. Thus, the defendant maintains that an evidentiary hearing must be held on this issue under the authority of *Franks v. Delaware*, 438 U.S. 154, 155–56, 98 S.Ct. 2674, 2676–77, 57 L.Ed.2d 667 (1978). The Ninth Circuit has established the following requirements for a *Franks* hearing:

(1) the defendant must allege specifically which portions of the warrant affidavit are claimed to be false; (2) the defendant must contend that the false statements or omissions were deliberately or recklessly made; (3) a detailed offer of proof, including affidavits, must accompany the

allegations; (4) the veracity of only the affiant must be challenged; and (5) the challenged statements must be necessary to find probable cause.

*United States v. Dicesare*, 765 F.2d 890, 894–95 (9th Cir.1985).

The defendant here alleges that Special Agent Webb made several misstatements and omissions in his warrant affidavit. First, the defendant argues that Webb misrepresented the strength of two eyewitness identifications of Shaun Small. As the defendant points out, Special Agent Webb stated in his affidavit that Paul Dimon, a GSA employee who saw the delivery man with the flowers on the date of the explosion, "was shown a photo spread and positively identified Shaun Small as being identical to the person he observed carrying a basket of flowers in the lobby of the Tishman Building on Monday afternoon November 17." According to the defendant, this statement is inconsistent with the FBI report of Dimon's photo identification, which states:

Dimon advised that he was having some difficulty in identifying the individual he observed in the lobby of the Tishman Building on November 17, 1986, at approximately 1:30 p.m. due to the individual wearing a wig, mustache and beard. Dimon said he was not absolutely positive, but the individual in the upper left hand corner of the photospread appeared to be the individual he observed on above date and place. [¶] Dimon signed his name and dated the backside of the photograph of Shaun Jerome Small.

Exhibit C to Defendant's Motion to Suppress.

The defendant also maintains that the affidavit mischaracterized Swanstrom's statements regarding the identity of the delivery man who attempted to deliver flowers to his home. According to the affidavit, Swanstrom "identified [the delivery man] as Shaun Small." The defendant contends that this statement is inconsistent with the FBI investigation report, which states:

Swanstrom stated that he never saw the face of the individual who attempted to

deliver the flower arrangement at his door. However, Swanstrom stated that the voice sounded like that of Sean Small, a young male who does maintenance work for Swanstrom's son-in-law, Peter Pilaski. Swanstrom stated the voice and general physical description of this individual matched Sean Small whom he and his wife have met on various occasions.... [¶] Swanstrom concluded by stating that he is certain the individual who attempted to deliver the flower arrangement was Sean Small.

Exhibit D to Defendant's Motion to Suppress.

The defendant's allegations in this case plainly satisfy the first four requirements for a *Franks* hearing. The defendant has specifically alleged the portions of the affidavit claimed to be false. He contends that these false statements or omissions were deliberately or recklessly made. His offer of proof consists of reports made by the FBI agents themselves. Furthermore, the defendant calls into question the veracity of the affiant himself. Thus, the dispute revolves primarily around the fifth requirement for a *Franks* hearing, that "the challenged statements must be necessary to find probable cause." *United States v. Dicesare*, 765 F.2d 890, 895 (9th Cir.1985). We therefore turn to a discussion of this issue.

In determining whether the fifth requirement for a *Franks* hearing is met, the Ninth Circuit has adopted different approaches for material misstatements and material omissions in a warrant affidavit. For material misstatements, a court must "set the afidavit's false assertions to one side and then determine whether the affidavit's remaining content is still sufficient to establish probable cause." *United States v. Ippolito*, 774 F.2d 1482, 1485 (9th Cir.1985) (citing *Franks v. Delaware*, 438 U.S. 154, 156, 98 S.Ct. 2674, 2676, 57 L.Ed.2d 667 (1978)). For material omissions, the affidavit must simply be considered "with the omitted truths included." *United States v. Condo*, 782 F.2d 1502, 1506 (9th Cir.1986). If the affidavit is not sufficient to establish probable cause with the material misstatements omitted, or

with the omitted truths included, then the "warrant must be voided and the fruits of the warrant suppressed." *Ippolito*, 774 F.2d at 1485.

█ The parties here dispute whether this case should be analyzed as a material misstatement or a material omission of facts. According to the defendant, the challenged statements should simply be omitted from the affidavit, and the affidavit then examined to determine whether its remaining content supports a finding of probable cause. However, the government contends that the affidavit should be examined as if it contained the "true" facts as reported in the FBI investigation reports. The court agrees with the government. Both of the statements challenged by the defendant are technically accurate characterizations of the eyewitness identifications as reported in the FBI investigation reports. According to the reports, Swanstrom did "identify" the delivery man as Shaun Small, and Dimon "positively identified Shaun Small as being identical to the person he observed." At bottom, the defendant's allegations here amount to a claim that the warrant affidavit should also have stated that Swanstrom "never saw the face" of the delivery man, and that Dimon "was having some difficulty in identifying the individual" and "was not absolutely positive" of his photo identification. This clearly constitutes a claim of material omission rather than material misstatement. Thus, the court finds it appropriate to delete the allegedly misleading statements from the warrant affidavit "and insert the omitted truths." *Ippolito*, 774 F.2d 1482, 1486–87 n. 1.

█ Examining the warrant affidavit as if it contained the "true" description of the eyewitness identifications in the FBI reports, the court finds that probable cause would still have existed for the search warrants. It is undisputed that Dimon picked the defendant out from six photographs and stated that he "appeared to be the individual" who had delivered the flowers. Furthermore, Swanstrom stated without qualification that he was "certain" the de-

livery man was Shaun Small based upon the individual's voice and general physical characteristics. Finally, the warrant affidavit states that Melanie Pilaski herself identified Shaun Small as a possible suspect in the explosion. *See* Affidavit of Patrick J. Webb at ¶ 8, Exhibit A to Defendant's Motion to Suppress. Thus, even if the Special Agent had informed the Magistrate that Dimon "was not absolutely positive" of his photo identification, and that Swanstrom "never saw the face" of the delivery man, the Magistrate could still properly have concluded that probable cause existed for the searches. Thus, the defendant has failed to demonstrate an entitlement to a *Franks* evidentiary hearing based upon Special Agent Webb's alleged mischaracterizations of the eyewitness identifications.

The defendant also contends that Special Agent Webb improperly failed to inform the Magistrate that the delivery man was wearing a disguise, and that other witnesses could not identify Shaun Small as the delivery man. However, for the reasons discussed above, the court finds that probable cause would have existed even if the Magistrate had been so informed. This information would not have changed the fact that two witnesses did identify Small as the delivery man, even in his disguise, and Melanie Pilaski herself named him as a suspect. Thus, the court concludes that the defendant has failed to satisfy the threshold requirements for a *Franks* evidentiary hearing.

### 3. Compliance With Rule 41(c)(2)(A) and (G)

■ Federal Rule of Criminal Procedure 41(c)(2) provides in relevant part:

(A) ... If the circumstances make it reasonable to dispense with a written affidavit, a Federal magistrate may issue a warrant based upon sworn oral testimony communicated by telephone or other appropriate means....

(G) ... Absent a finding of bad faith, evidence obtained pursuant to a warrant issued under this paragraph is not subject to a motion to suppress on the ground that the circumstances were not such as to make it reasonable to dispense with a written affidavit.

The defendant in this case contends that he has made a preliminary showing sufficient to entitle him to an evidentiary hearing on the officers' bad faith in applying for an oral telephonic warrant. He points out that the FBI "delayed" for more than eight hours before obtaining a search warrant, even though the suspicions regarding Small's involvement arose early in the investigation. According to the defendant, "the facts here reveal that the government sought to present an inaccurate and incomplete affidavit to the Magistrate at an hour well past bed time for most working people in order to discourage any rigorous examination of the facts allegedly supporting the issuance of the search warrant." Defendant's Reply at 13–14. However, the court finds that these conjectural allegations are not sufficient to justify an evidentiary hearing. As the declaration of Special Agent Webb indicates, the delay was necessary to conduct interviews and compile information for a showing of probable cause. There is absolutely no specific evidence that the eight hour delay was motivated by bad faith. Thus, the court concludes that an evidentiary hearing is not necessary on the issue of compliance with Rule 41(c)(2)(A) and (G).

### 4. Compliance With Rule 41(c)(2)(B)

■ Federal Rule of Criminal Procedure 41(c)(2)(B) provides that a person requesting a telephone warrant read the warrant "verbatim" to the issuing Magistrate. The defendant in this case alleges that Special Agent Webb failed to comply with this requirement. However, the record reveals that the Special Agent did in fact read all three of the warrants "verbatim" to the Magistrate. The only arguable deviation from the strict requirements of Rule 41(c)(2)(B) was that the Special Agent did not repeat the list of items to be seized at each of the two residences, but instead simply listed the items in his affidavit and referred back to that list when he read the warrants. However, the Magistrate specifically asked Special Agent Webb whether

the list in his affidavit would be identical to the list attached to both of the search warrants, and Special Agent Webb responded affirmatively. *See* Exhibit A to Defendant's Motion to Suppress at 15. Because the list of items to be seized was read to the Magistrate, the court finds that the requirements of Rule 41(c)(2)(B) were satisfied.

■ Furthermore, as the government points out, suppression of evidence for noncompliance with Rule 41 is mandated only where the violation was "fundamental," or where:

(1) There was prejudice in that the search might not have occurred or would not have been so abrasive if the Rule had been followed; or (2) there is evidence of intentional and deliberate disregard of a provision of the Rule.

*United States v. Ritter*, 752 F.2d 435, 441 (9th Cir.1985). In this case, the alleged noncompliance with Rule 41 was plainly not so "fundamental" as to "render the search unconstitutional under traditional fourth amendment standards." *United States v. Johnson*, 660 F.2d 749, 753 (9th Cir.1981), *cert. denied*, 455 U.S. 912, 102 S.Ct. 1263, 71 L.Ed.2d 452 (1982). Furthermore, there is every reason to believe that the searches would have occurred exactly as they did even if the Special Agent had repeated the list of items to be seized each time he read a warrant. Finally, there is no evidence of intentional or deliberate disregard of the Rule. Thus, the motion to suppress on these grounds must be denied.

### 5. *Waiver of Miranda Rights*

■ The evidence at the evidentiary hearing held before this court revealed the following facts with respect to the defendant's statements to FBI agents on the day of arrest:

On the morning of November 18, 1986, Small telephoned the San Francisco police from Clearlake, stating that he understood he was a suspect in the bombing and he wished to speak with the police. *See* Tr. 6/3/87. Small was told to remain at the Clearlake residence, where he was arrested later in the day by local law enforcement officers and brought to the Clearlake Sheriff's substation. At about 11:50 a.m., three FBI agents entered the small office where Small was being held in handcuffs. The agents identified themselves and advised Small that he was under arrest. *See* Tr. 4/6/87 at 9–11, 17. Special Agent Stewart Daley gave Small an "Advice of Rights" form and asked him to read it aloud. *Id.* at 14. Small immediately stated that he was anxious to speak to the agents, and began to talk about the Pilaskis and his relationship with them. *Id.* After about three or four sentences, Daley interrupted Small and asked him again to read the form out loud. *Id.* at 14, 15, 18. Small read the form out loud without any problems, appearing lucid, coherent, and cooperative. *Id.* at 33.

After reading the form, Small indicated that he did not understand what the term "waiver" meant. *Id.* at 19. Daley told him it meant "he could decide to set aside his rights that were explained on the form and talk to us knowing he could refuse to answer any question and stop the interview whenever he wished." *Id.* at 20. Small then indicated that he did not wish to sign the form. *Id.* at 22. Daley began to make a notation on the form that Small wished to talk to the agents but did not want to sign the form. *Id.* at 22, 23. While Daley was making the notation, Special Agent John Steiner explained to Small that, without his signature, there was no proof that Small had been advised of his rights. *Id.* at 35, 48. Small then changed his mind and signed the form. *Id.* at 24, 35; *see* Exh. C. Daley had just begun his notation when Small changed his mind, and only got as far as writing the name "Shaun J. Small" on the form. *Id.* at 23. The interview continued after Small signed the form.

Small now seeks to suppress all of his statements to FBI agents at the Clearlake sheriff's substation. As the defendant points out, it is the government's burden to prove that he knowingly and voluntarily waived his *Miranda* rights. *See North Carolina v. Butler*, 441 U.S. 369, 373, 99 S.Ct. 1755, 1757, 60 L.Ed.2d 286 (1979). There are two distinct dimensions to the inquiry:

First the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion or deception. Second, the waiver must have been made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the 'totality of the circumstances surrounding the interrogation' reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the Miranda rights have been waived.

*Moran v. Burbine,* 475 U.S. 412, 106 S.Ct. 1135, 1141, 89 L.Ed.2d 410 (1986).

The court finds that the government has satisfied its burden with respect to both elements of this inquiry. First, the record amply demonstrates that Small was eager to talk to law enforcement officers. He himself called the police in order to request an interview on the morning of November 18. The FBI agents testified without contradiction that Small wanted to talk even though he did not want to sign the form. There is no evidence of any intimidation, coercion, or deception, and the court therefore finds that Small's decision to talk was "the product of a free and deliberate choice." [1] Second, Small was fully informed of the nature of the right being abandoned and the consequences of abandoning it. The waiver form that he read out loud clearly informed Small that he had a right to remain silent, that anything he said could be used against him in court, that he had a right to counsel before and during questioning, that a lawyer could be appointed for him if he could not afford one, and that he had the right to stop the questioning at any time. Small had no trouble reading the form, and was coherent and lucid at the time. Although Daley's oral explanation of the term "waiver" could

have been more precise and complete, the totality of circumstances indicates that Small had the requisite level of comprehension to waive his *Miranda* rights.

The defendant places great reliance upon *United States v. Heldt,* 745 F.2d 1275 (9th Cir.1984). In that case, the defendant refused to sign a printed waiver form after his arraignment on misdemeanor charges. The FBI agent told the defendant that he did not have to sign the form, but asked if he would be willing to answer questions anyway. The defendant agreed, and the agent proceeded to question him for about three hours. The Ninth Circuit concluded that the defendant's *Miranda* rights had been violated because the agent had failed to inform the defendant that his failure to sign the waiver form did not prevent his statements from being used against him in court. *See id.* at 1277–79. The court noted that "Heldt could reasonably have believed that he waived nothing because he had refused to sign." *Id.* at 1277.

This case plainly presents a different situation from *Heldt.* Unlike Heldt, Small did ultimately sign the printed waiver form, and the waiver form clearly informed him of his *Miranda* rights. Thus, there was no reasonable basis for Small to believe that he had waived nothing, as there was for Heldt. If Small had persisted in his refusal to sign the form, then the *Heldt* decision would have required the agents to explain that the refusal did not prevent Small's statements from being used against him in court. Because Small ultimately agreed to sign the form, however, *Heldt* is simply inapposite.

In sum, the court finds that the defendant freely and voluntarily waived his *Miranda* rights, and the motion to suppress his statements at the Clearlake Sheriff's substation is therefore denied.

---

1. The defendant makes a point of the fact that Special Agent Daley wrote Small's name in cursive on the waiver form when he was preparing to explain in writing that Small wanted to talk but was unwilling to sign the form. The court is entirely unpersuaded by the unstated suggestion that Daley was forging Small's signature or engaging in some other form of deception. If Daley had intended to forge Small's signature, he obviously would have written Small's name on the signature line of the form, which he did not do. Furthermore, Daley's cursive and Small's signature do not look anything alike, and it is simply implausible to suggest that any FBI agent would think he could get away with such a forgery.

### 6. Consent to Clearlake House and Automobile Search

■ During the course of the interview with Small at the Clearlake Sheriff's substation, the FBI agents asked Small if he would consent to a search of the Clearlake residence. The agents explained that they wished to search for explosive devices, and that the search was necessary to ensure public safety. *See* Tr. 4/6/87 at 25–26. According to the uncontradicted testimony of the agents, Small never expressed any reluctance to permit the searches, and he actually expressed an interest in showing the agents the house. *Id.* at 36–37. The agents never told Small that he had to consent to the search or that he had no choice in the matter. *Id.* at 36. According to the agents, Small willingly signed consent forms for the agents to search both the Clearlake residence and his own automobile. *See* Exh. EH–3, EH–4.

"When a prosecutor seeks to rely upon consent to justify the lawfulness of a search, he has the burden of proving that the consent was, in fact, freely and voluntarily given. This burden cannot be discharged by showing no more than acquiescence to a claim of lawful authority." *Bumper v. North Carolina*, 391 U.S. 543, 548–49, 88 S.Ct. 1788, 1792, 20 L.Ed.2d 797 (1968). Although the subject's knowledge of the right to refuse to consent is a factor to be taken into account, "the prosecution is not required to demonstrate such knowledge as a prerequisite to establishing a voluntary consent." *Schneckloth v. Bustamonte*, 412 U.S. 218, 249, 93 S.Ct. 2041, 2059, 36 L.Ed.2d 854 (1973).

On the basis of the FBI agents' testimony, the court finds that the defendant freely and voluntarily gave his consent to the searches of the Clearlake residence and his automobile. The agents did not represent to the defendant that he had to submit to the searches, and no evidence was presented at the evidentiary hearing that the defendant was under that impression. Indeed, the uncontradicted evidence shows that the defendant willingly agreed to the searches and signed the consent forms.

Thus, the court denies the motion to suppress the products of these searches.

### 7. The Shipping Invoice

■ During the December 6 search of Small's Clipper Street residence, the three FBI agents conducting the search found an invoice with Small's name on it bearing the words "pyrotechnics" and "chemical powder and explosives." The parties are agreed that this invoice was not within the scope of the warrant. Thus, the court must determine whether the invoice was properly seized under the "plain view" exception to the warrant requirement.

The three FBI agents who conducted the December 6 search were each assigned different tasks. Special Agent George Aradi was directed to photograph the premises before, during, and after the search. *See* Tr. 4/20/87 at 14. Aradi photographed the living room prior to the search, including the stack of books in which the invoice was later found. *Id.* at 7–8; Exh. EH 6–6. After Aradi took the photographs, Agent Craig Lewis was assigned to search the living room. Lewis testified that he saw a manila envelope sticking out of the pile of books, and he thought it might be a GSA envelope of the kind included in the search warrant. *Id.* at 46. He walked over to the pile of books, and saw the invoice sticking out from underneath one of the books. *Id.* Without moving any of the books or the invoice, Lewis was able to see Shaun Small's name on the invoice, and the words "pyrotechnics" and "chemical powder and explosives." Lewis called Agents Stockton Buck and Aradi over, and they decided to move the document, put it on top of the pile of books, and photograph it. *Id.* at 47; *see* Exh. EH 6–7. The agents discussed whether it was legal to seize the invoice, and decided to do so. *Id.* at 50–51.

Agent Aradi also testified that the invoice was found on top of a manila envelope, and that there was a book partially covering the invoice. Before the invoice was moved, Aradi recalled seeing the name Shaun Small and the words "pyrotechnics" and "chemical powders and explosives." *Id.* at 24–25. Agent Buck testified that he

also remembered something being on top of the invoice when he first saw it, but that he could read the name Shaun Small and the words "pyrotechnics" and "chemical powders and explosives" before the invoice was moved. *See* Tr. 5/29/87 at 22–23.

Under the "plain view" doctrine, a warrantless seizure of private possessions by the police is constitutionally permissible if three requirements are met: (1) the police have made a lawful intrusion or are properly in a position to view a particular area; (2) they discover incriminating evidence inadvertently, without knowing the location of the evidence or intending to seize it in advance; and (3) the police have probable cause to believe that the items they observe may be evidence of a crime, contraband, or otherwise subject to seizure. *See Arizona v. Hicks,* —— U.S. ——, 107 S.Ct. 1149, 1153, 94 L.Ed.2d 347 (1987); *Texas v. Brown,* 460 U.S. 730, 736–37, 103 S.Ct. 1535, 1540–41, 75 L.Ed.2d 502 (1983) (citing *Coolidge v. New Hampshire,* 403 U.S. 443, 465–70, 91 S.Ct. 2022, 2037–40, 29 L.Ed.2d 564 (1971) (plurality opinion)).

The court finds that the government has established all three elements of the "plain view" doctrine in this case. The three FBI agents were lawfully within Small's apartment pursuant to a valid search warrant. The invoice was discovered inadvertently, and the agents did not know of it or intend to seize it in advance. Furthermore, because of the obvious relationship between the invoice and the crime under investigation, there was probable cause to believe that the invoice was evidence of the defendant's involvement in the crime. The defendant's reliance upon *Arizona v. Hicks,* —— U.S. ——, 107 S.Ct. 1149, 94 L.Ed.2d 347 (1987), is simply misplaced. In that case, a police officer came across expensive stereo equipment while he was lawfully within an apartment. Although he lacked probable cause to believe the equipment was stolen, the officer moved the stereo in order to record the serial numbers. The Supreme Court held that the search was not justified under the "plain view" doctrine because the officer lacked probable cause. In this case, by contrast, the agents had probable cause to believe the invoice

was evidence of the defendant's involvement in the crime because it had the defendant's name on it and it listed items connected with the crime.

The defendant points out a number of minor inconsistencies and problems with the FBI agents' testimony in an attempt to discredit their claim that the invoice was in plain view when they found it. None of these inconsistencies and problems are persuasive to the court, however. First, although it is true that Agents Aradi and Buck differed over whether the bottom half or the right half of the invoice was obscured, both agreed that the upper left of the invoice with the incriminating words was visible. The court attributes the differences in their testimony to imperfect memory rather than deliberate fabrication. Second, although it would have been helpful if the agents had taken a close-up photograph of the invoice as they originally found it, their failure to do so is also not evidence of deliberate fabrication. The court found the agents' testimony and demeanor to be credible, and their failure to photograph the invoice was likely a simple oversight. Third, the court does not deem it to be greatly significant that the invoice was not found by agents during the first search of Small's apartment. It is entirely possible that the agents simply missed the invoice during the first search, especially if it was hidden within the books. Furthermore, the testimony indicated that someone had been in the apartment to remove the furniture and other personal belongings between the two searches. Thus, it is also possible that the invoice was not in the apartment during the first search.

Finally, the court is not persuaded by the defendant's arguments regarding the photograph of the pile of books in the living room before the search was conducted. *See* Exh. EH 6–6. The defendant apparently contends that the photograph shows very little of the invoice to be protruding from underneath the book. After carefully comparing the photograph with the reproductions of the invoice itself, however, the court is convinced that Shaun Small's name and the words "pyrotechnics" and "chemi-

cal powder and explosives" could have been protruding from underneath the book. Thus, the court finds that the invoice was properly seized by the FBI agents pursuant to the "plain view" doctrine.

## CONCLUSION

The defendant's motion to suppress is denied in its entirety.

IT IS SO ORDERED.