UNITED STATES of America,
Plaintiff-Appellee,

v.

David R. HUBER, Defendant-Appellant.

No. 84–3115.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Aug. 7, 1985.

Decided Sept. 27, 1985.

Ronald D. Howen, Asst. U.S. Atty., Boise, Idaho, for plaintiff-appellee.

Sam Hoagland, Pocatello, Idaho, for defendant-appellant.

Before PREGERSON and WIGGINS, Circuit Judges, and HILL,* District Judge.

PREGERSON, Circuit Judge:

David Huber appeals his conviction for one count of conspiracy and one count of aiding and abetting the transportation and sale of stolen rifles. His principal contention is that admission of an out-of-court statement by his alleged coconspirator violated the hearsay rule and the sixth amendment's confrontation clause. He also challenges numerous other rulings by the district court and asserts that the government produced insufficient evidence to establish his guilt beyond a reasonable doubt. We reverse his conviction.

FACTS

Huber was the resident manager of National Self Storage in Murray, Utah, a facil-

* The Honorable Irving Hill, Senior United States District Judge for the Central District of Califor- nia, sitting by designation.

ity that rents storage lockers to the public. Llewelyn James, a gun collector, kept some Sako rifles at National Self Storage. He died in October 1983, and his son Richard James began an inventory of his father's effects. Richard James attempted to enter his father's lockers at National Self Storage, but found that his father's keys would not work in one of the padlocks, which was then removed by Huber's stepson using a set of bolt cutters. After entering the locker, Richard James discovered that four Sako rifles on his father's inventory were missing. He then made a list of the serial numbers of the remaining rifles.

In late February 1984, the FBI in Pocatello, Idaho received information about a possible theft of Sako rifles from a storage facility in or near Salt Lake City. The FBI traced this lead to Llewelyn James's rifle collection at National Self Storage. On March 6, Richard James, alerted by the FBI, found that his father's locker had already been broken into and that the 23 remaining Sako rifles had been stolen.

On March 7, FBI undercover agent John Munis met in Pocatello with an individual named Thomas Liday who offered to sell him some stolen rifles. At Huber's trial, FBI agent Munis testified that Liday said that he had stolen these rifles in Salt Lake City with the cooperation of an individual who owned or managed a locker facility. Liday was arrested after he showed Munis a Sako rifle with a serial number that matched a rifle stolen from James's locker at National Self Storage. A search of Liday's house uncovered all but one of the 23 stolen rifles.

The FBI also found a light green Ford sedan with Utah license plates parked outside Liday's house. The FBI traced this car to Gail Holmes, a Utah resident. At Huber's trial, Holmes testified that she had arranged to sell the car to Huber and had let him use it pending her efforts to remove a mechanic's lien upon it. She further testified that Huber had told her on March 8 that he was expecting to receive $2300 from Idaho in the near future.

A grand jury indicted Huber for conspiring with Liday and for aiding and abetting him in the theft, transportation, and sale of stolen property in violation of 18 U.S.C. §§ 2, 371, 2314, and 2315. Liday was indicted, tried, and convicted in separate proceedings.

During Huber's trial, the government discovered that a Sako rifle previously found in a search of Huber's house had belonged to Llewelyn James. This rifle was not one of the 23 that was discovered stolen on March 6, but was one of the four that Richard James found missing and unaccounted for in his initial inventory of the rifle collection at National Self Storage shortly after his father's death.

Huber testified in his own defense. He stated that he had known Liday since childhood, but claimed to have lost contact with him until February of 1984, when the two met socially in Pocatello. Huber testified that at this meeting, he agreed to sell Gail Holmes's car to Liday, believing that Holmes had already transferred title of the car to him. Liday and Huber met again at National Self Storage on March 3 where they closed the sale. Huber denied knowing what Liday did with the car afterward. As to his possession of one of Llewellyn James's missing Sako rifles, Huber testified that he had purchased it through an advertisement in a local magazine. He could not, however, produce the ad or find the individual from whom he had allegedly made the purchase. Finally, Huber denied any memory of his alleged statement to Gail Holmes that he was expecting $2300 from Idaho, but speculated that this could have referred to the expected proceeds from the intended sale of two motorcycles.

## DISCUSSION

### A. Admission of Liday's Statement

Huber contends that the district court erred in allowing FBI agent Munis to testify as to the out-of-court statement by alleged coconspirator Thomas Liday that he had stolen the rifles in Salt Lake City with the cooperation of an individual who owned or managed a locker facility. At trial, Huber objected to Munis's testimony on

grounds of hearsay. The district court, however, relying upon Fed.R.Evid. 801(d)(2)(E), held that the testimony was not hearsay. On appeal, Huber contends that admission of this testimony violated the sixth amendment's confrontation clause as well as the hearsay rule. Huber also challenges instructions the district court gave the jury concerning this evidence.

### 1. Confrontation Clause

Simply because a coconspirator statement is excluded from the definition of hearsay by Fed.R.Evid. 801(d)(2)(E) does not dispose of the question whether its admission into evidence violates the confrontation clause. *United States v. Ordonez*, 737 F.2d 793, 803 (9th Cir.1984); *United States v. Adams*, 446 F.2d 681, 683 (9th Cir.), *cert. denied*, 404 U.S. 943, 92 S.Ct. 294, 30 L.Ed.2d 257 (1971).

■ The government argues that Huber waived this issue because, although he objected on hearsay grounds, he failed to make a confrontation clause objection at trial. However, under the plain error doctrine, the lack of a timely and specific objection before the district court does not preclude our review of Huber's confrontation clause claims. *Ordonez*, 737 F.2d at 799; *United States v. Traylor*, 656 F.2d 1326, 1333 (9th Cir.1981). *But cf. United States v. Vincent*, 758 F.2d 379, 381 n. 1 (9th Cir.1985) (declining to reach confrontation clause issues where defendant failed to object at trial).

In *Ohio v. Roberts*, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980), the Supreme Court established a two-pronged test to determine whether admission of an out-of-court coconspirator statement violates the confrontation clause. The first prong looks to the necessity of admitting the statement by examining whether the declarant, i.e., the person who uttered the coconspirator statement the government wishes to introduce, is unavailable to testify. *Id.* at 65, 100 S.Ct. at 2538. The second prong looks to the reliability of the statement. *Id.* In this case, the government concedes that Liday was available to

testify and that its decision not to call him as a witness was purely tactical. We therefore need only consider the first (or "necessity") prong of the *Roberts* test because the second prong only "operates once a witness is shown to be unavailable." *Id.*

The *Roberts* court noted, in discussing the necessity prong of its confrontation clause test, that "[i]n the usual case ... the prosecution must either produce, or demonstrate the unavailability of, the declarant whose statement it wishes to use against the defendant." *Id.* As an exception to this general rule, *Roberts* cited *Dutton v. Evans*, 400 U.S. 74, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970), where "the Court found the utility of trial confrontation so remote that it did not require the prosecution to produce a seemingly available witness." *Roberts*, 448 U.S. at 65 n. 7, 100 S.Ct. at 2538 n. 7. The value of trial confrontation under this standard depends upon whether out-of-court coconspirator statements are "crucial to the prosecution" or "devastating to the defendant," *United States v. McClintock*, 748 F.2d 1278, 1292 (9th Cir. 1984); *United States v. Perez*, 658 F.2d 654, 661 (9th Cir.1981) (dictum), or, stated somewhat differently, whether they are "of peripheral significance" in the case. *Dutton*, 400 U.S. at 87, 91 S.Ct. at 219.

■ The government argues that admitting Liday's coconspirator statement was not "crucial to the prosecution" or "devastating to the defendant" because of the other evidence introduced at trial of Huber's guilt. We disagree. Liday's statement was clearly an important and integral part of the government's case. It was of far greater significance than the coconspirator statement admitted in *Dutton*, where the prosecution's other evidence consisted of the live testimony of nineteen witnesses including one of the defendant's alleged accomplices. *Id.* Moreover, all of the other evidence against Huber was circumstantial. Liday's coconspirator statement was the only evidence that directly linked Huber to the theft of the rifles. Thus, Liday's coconspirator statement was "crucial to the prosecution," "devastating to the defend-

ant," and was not "of peripheral significance" in the case.

For substantially the same reasons, we reject the government's contention that admission of Liday's statement was "harmless beyond a reasonable doubt." *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967). We find particularly unpersuasive the government's argument that reversal is unwarranted because Huber has failed to demonstrate that Liday's live testimony would contradict his alleged out-of-court statement. Trial confrontation might cause a witness to recant his accusatory statement. It also allows the jury to observe the demeanor of the witness and assess his credibility under cross-examination.

We therefore conclude that the testimony of FBI agent Munis that coconspirator Liday said that he had stolen the rifles in Salt Lake City in cooperation with an individual who owned or managed a locker facility violated the confrontation clause, is not harmless error, and requires reversal of Huber's conviction.

### 2. Hearsay . .

Huber contends that Liday's statement did not fall within the so-called coconspirator exception to the hearsay rule because the government failed to establish, by independent evidence, a prima facie case of the existence of a conspiracy between Huber and Liday. *See United States v. Bell*, 742 F.2d 509, 512 (9th Cir.1984); *United States v. Snow*, 521 F.2d 730, 733 (9th Cir.1975), *cert. denied*, 423 U.S. 1090, 96 S.Ct. 883, 47 L.Ed.2d 101 (1976). Because we have concluded that admitting Liday's statement violated the confrontation clause, we need not address this issue.

### 3. Jury Instructions

In admitting Liday's statement into evidence, the district court explained to the jury the legal requirements to admit a coconspirator statement, including that "[t]here must be substantial evidence of the existence of a conspiracy, but there need be only slight evidence of defendant's connection with it." Although the court itself made the decision to admit the coconspirator statement, it gave this instruction apparently to explain its ruling and to allow the jury to disregard the statement if it concluded on its own that a proper foundation had not been laid. Huber contends that the instruction was erroneous insofar as it stated that only "slight evidence" was necessary to show the defendant's connection to the conspiracy.[1] We agree.

The district court's "slight evidence" instruction accords with some earlier Ninth Circuit cases involving an accused conspirator's challenge to the sufficiency of the evidence. *See, e.g., Fox v. United States*, 381 F.2d 125, 129 (9th Cir.1967). However, in *United States v. Dunn*, 564 F.2d 348, 356–57 (9th Cir.1977), the court restated the proper standard for review of the evidence in conspiracy cases. As Judge Ely there explained, "the word 'slight' properly modifies 'connection' and not 'evidence.'" *Id.* at 357. Thus, the proper test is whether there is sufficient evidence of a *slight connection* between the defendant and the conspiracy. *Id. See also, e.g., United States v. Murray*, 751 F.2d 1528, 1534 (9th Cir.1985); *United States v. Kenny*, 645 F.2d 1323, 1335 (9th Cir.), *cert. denied*, 454 U.S. 828, 102 S.Ct. 121, 70 L.Ed.2d 104 (1981). The *Dunn* "slight connection" rule, originally formulated in cases involving challenges to the sufficiency of the evidence, has also been applied to the issue involved here—the quantum of independent evidence necessary for the admission of a coconspirator statement.[2]

---

**1.** Huber also suggests that this instruction may have confused the jury as to the government's ultimate burden of proof. The record clearly shows, however, that, in its final jury charge, the district court properly instructed that "the government must prove ... beyond a reason-

able doubt ... [t]hat the defendant joined the conspiracy." (RT 441–42).

**2.** We are aware that after *Dunn* some Ninth Circuit cases have continued to follow the old "slight evidence" rule in connection with the admission of a coconspirator statement. *E.g.,*

*E.g., United States v. Rabb,* 752 F.2d 1320, 1325 (9th Cir.1984), *cert. denied,* — U.S. ——, 105 S.Ct. 2027, 85 L.Ed.2d 308 (1985); *United States v. Miranda-Uriarte,* 649 F.2d 1345, 1349 (9th Cir.1981); *United States v. Weiner,* 578 F.2d 757, 769 & n. 7 (9th Cir.), *cert. denied,* 439 U.S. 981, 99 S.Ct. 568, 58 L.Ed.2d 651 (1978).

We therefore believe that the district court's slight evidence instruction was erroneous. Because we have already found reversible error in the admission of Liday's coconspirator statement, we decline to reach the question whether the erroneous explanatory instruction would constitute a separate ground for reversal of the conviction.[3]

### B. *Admission of the Inventory of Rifles*

Huber next challenges the district court's admission of an inventory of firearms [Exhibit 38] prepared by Llewellyn James, the owner of the rifles, who died before the theft. The government used this document to show that the Sako rifle found in Huber's house was one of the four belonging to Llewellyn James that his son Richard found missing and unaccounted for in his initial inventory of his father's collection at National Self Storage. At trial, Huber objected to this exhibit on grounds of hearsay, but the district court admitted it under the "business records" hearsay exception." Fed.R.Evid. 803(6). Huber now challenges admission of the inventory under the confrontation clause as well.

### 1. Confrontation Clause

■ The sixth amendment questions presented by this issue differ substantially from those involved in the admission of FBI agent Munis's testimony concerning Liday's coconspirator statement. Because the person who drew up the inventory is dead, the first (or "necessity") prong of the *Ohio v. Roberts* test is satisfied. We thus proceed to the second prong and determine the reliability of the statement by considering the following factors: 1) whether the statement contained assertions of past fact; 2) whether the declarant had personal knowledge of the matters asserted; 3) whether it was possible that the declarant was relying upon faulty recollection; and 4) whether the circumstances under which the statement was made indicate that the declarant had a motive to misrepresent the facts asserted. *United States v. Ordonez,* 737 F.2d 793, 802–03 (9th Cir.1984); *United States v. Perez,* 658 F.2d 654, 661 (9th Cir.1981) (citing *Dutton v. Evans,* 400 U.S. 74, 88–89, 91 S.Ct. 210, 219, 27 L.Ed.2d 213 (1970)).

■ Exhibit 38 satisfied all of these criteria. The statements contained in the inventory concerned matters of present fact of which the declarant had personal knowledge. The declarant did not rely upon his recollection in making the inventory and had no apparent motive to falsify the information. Thus, admission of the inventory into evidence did not violate the confrontation clause.

### 2. Hearsay

Huber challenges the district court's ruling that the inventory was admissible under the "business records" hearsay exception. He asserts that the government did not adequately establish when Exhibit 38 was written, what the source of the infor-

---

*United States v. Fried,* 576 F.2d 787, 793 n. 7 (9th Cir.), *cert. denied,* 439 U.S. 895, 99 S.Ct. 255, 58 L.Ed.2d 241 (1978). We need not address this apparent conflict. In a case such as this, where the government alleges a conspiracy consisting of only two specifically identified members, the quantum of proof necessary to prove the existence of the conspiracy itself cannot differ from that necessary to prove one of the members' connection with it. It would be logically impossible for there to be substantial evidence of a conspiracy between Huber and Liday but only slight evidence of Huber's connection with this conspiracy. Thus, the slight evidence rule cannot apply here.

**3.** There is also substantial doubt as to whether Huber has preserved this issue for appeal. Huber did not specifically object to the instruction at trial. Arguably, on the theory that Huber's claim raises constitutional questions, we could review it under the plain error doctrine. In any event, it is unnecessary for us to resolve this issue.

mation was, or whether the inventory was prepared in accordance with Llewellyn James's normal record-keeping practices.

■ The testimony of Richard James that it was his father's regular practice to maintain an inventory of his firearms adequately established that Exhibit 38 was "kept in the course of a regularly conducted business activity, and [that] it was the regular practice of that business activity to make [the inventory]" [4] Fed.R.Evid. 803(6). Moreover, there is no requirement that the government show precisely when the inventory was compiled. All that the rule requires is that the document be made "at or near the time" of the act or event it purports to record. The testimony of Richard James established that the inventory was made between September 7, 1982 and October, 1983, when Llewellyn James owned all of the rifles in question. This is sufficient.

Huber also argues that the fact that four of the rifles on the list were missing and unaccounted for after Llewellyn James's death "indicate[s] a lack of trustworthiness" of the document under Rule 803(6). This contention, however, in the context of this case, addresses the weight of the evidence rather than its admissibility. The government's theory was that four rifles on the list were missing because Huber had stolen them from the locker at National Self Storage before Richard James's initial inventory. Huber's competing contentions as to the inferences to be drawn from these omissions raise issues of fact properly addressed to the jury. In short, Huber has not shown that the district court abused its discretion in rejecting his hearsay objection. *See, e.g., Keogh v. CIR*, 713 F.2d 496,

499 (9th Cir.1983) (applying abuse-of-discretion standard).

### C. *Wharton's Rule*

■ Huber contends that his conviction on both counts of the indictment violated the double jeopardy clause because the overt acts charged in the conspiracy count included the acts of aiding and abetting with which he was charged in substantive count II. The double jeopardy clause does not prohibit prosecution for both conspiracy and a substantive offense based upon the same conduct. *Pinkerton v. United States*, 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946). Huber, however, contends that his case falls within "Wharton's Rule," which provides that: "An agreement by two persons to commit a particular crime cannot be prosecuted as a conspiracy when the crime is of such a nature as to necessarily require the participation of two persons for its commission." *Iannelli v. United States*, 420 U.S. 770, 773–74 n. 5, 95 S.Ct. 1284, 1288 n. 5, 43 L.Ed.2d 616 (1975) quoting 1 R. Anderson, *Wharton's Criminal Law and Procedure*, § 89 at 191 (1957). Huber argues that because aiding and abetting necessarily requires the participation of two persons, it cannot be punished separately as a conspiracy.

■ This court, however, has rejected the argument that a defendant cannot be convicted of conspiring to cause another person to commit a crime in violation of 18 U.S.C. § 2(b).[5] *United States v. Giese*, 597 F.2d 1170, 1179–80 (9th Cir.), *cert. denied*, 444 U.S. 979, 100 S.Ct. 480, 62 L.Ed.2d 405 (1979). This reasoning applies equally to charges of conspiracy to aid and abet under 18 U.S.C. § 2(a). *See also United States v.*

---

**4.** Although Huber does not raise the point on appeal, the term "business activity" as used by the rule includes personal records kept for business reasons. *See Keogh v. C.I.R.*, 713 F.2d 496, 499–500 (9th Cir.1983) (personal diary recording income admissible as business record). *See generally* 4 Weinstein & Berger, *Weinstein's Evidence*, ¶ 803(6) [04] at 803–183–84. Richard James testified that his father had been a collector of firearms for fifteen years, that he belonged to a gun collector's association, and that he kept rifles both for sport and for "investment, speculative purposes." These facts estab-

lish that Llewellyn James's gun collection was a "business activity" within the meaning of Rule 803(6).

**5.** We also note parenthetically that Huber's argument mischaracterizes the nature of Wharton's Rule, which does not, as he contends, implicate double jeopardy rights. *Iannelli*, 420 U.S. at 782, 95 S.Ct. at 1292. Rather, Wharton's Rule is merely a "judicial presumption" used as a tool in statutory construction. *Id.*

*Herbert,* 698 F.2d 981, 985 (9th Cir.), *cert. denied,* —— U.S. ——, 104 S.Ct. 87, 78 L.Ed.2d 95 (1983) (offense of conspiracy is different from offense of aiding and abetting because aiding and abetting does not require prior agreement). This we reject Huber's argument.

### D. *Reopening the Case*

Huber argues that the district court erred in allowing the government to reopen its case to present newly discovered evidence, i.e. evidence that one of Llewellyn James's missing rifles was found in Huber's house. Huber asserts that he was surprised by the new evidence and had insufficient time to prepare to rebut it.

 To allow the reopening of a criminal case after the close of the evidence lies within the discretion of the trial judge. *United States v. Ramirez,* 608 F.2d 1261, 1267 (9th Cir.1979). Here, the court granted Huber a continuance to prepare his defense. When the trial resumed, Huber sought to exclude the new evidence but did not assert that the continuance had been insufficient. Thus, Huber has failed to demonstrate that the court abused its discretion by reopening the trial.

### E. *Sufficiency of the Evidence*

Huber also challenges the sufficiency of the evidence to support his conviction. Even though his conviction must be reversed on other grounds, we address this contention to determine whether double jeopardy principles preclude a retrial. *United States v. Bibbero,* 749 F.2d 581, 586 (9th Cir.1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 2330, 85 L.Ed.2d 847 (1985).

In determining the sufficiency of the evidence after a reversal for trial error, this court considers both the admissible and the inadmissible evidence. *United States v. DiCesare,* 765 F.2d 890, 900 (9th Cir.1985); *Bibbero,* 749 F.2d at 586 n. 3.

*See United States v. Harmon,* 632 F.2d 812 (9th Cir.1980) (per curiam) (after reversal for trial error, court does not review sufficiency of the evidence apart from inadmissible evidence). Thus, even though admission of FBI agent Munis's testimony concerning Liday's coconspirator statement violated the confrontation clause, we must consider that testimony along with the other evidence to determine whether a rational trier of fact could have found Huber guilty beyond a reasonable doubt. *See DiCesare,* 765 F.2d at 900; *Bibbero,* 749 F.2d at 586 n. 3.

In addition to FBI agent Munis's testimony that violated the confrontation clause, the government's evidence essentially consisted of: 1) the discovery of one of Llewellyn James's missing rifles in Huber's house;[6] 2) the testimony of Gail Holmes that Huber had told her that he was expecting $2,300 from Idaho; 3) Liday's possession of a car that previously belonged to Huber; 4) Huber's connection to the storage facility from which the rifles were stolen; and 5) the lack of evidence that any of the other lockers at National Self Storage was disturbed, suggesting that the thief had inside information as to which locker contained rifles. Though the government's case was not overwhelming, we believe that the evidence, when viewed in a light most favorable to the government, would permit a rational trier to find Huber guilty beyond a reasonable doubt. *See Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Thus, Huber may be retried.

REVERSED and REMANDED.

---

**6.** This rifle was not one of the 23 stolen in this case. Instead, the rifle found in Huber's house was one of four missing from James's locker at National Self Storage before the theft at issue here. The government argued that this rifle was admissible under Fed.R.Evid. 404(b) as showing knowledge, opportunity, or a common scheme or plan. The district court apparently admitted it on this basis. Because Huber does not challenge that ruling, we do not address it.