**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**James Douglas McQUISTEN,
Defendant-Appellant.**

No. 85–3110.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted May 6, 1986.

Decided July 29, 1986.

Thomas M. Coffin, Asst. U.S. Atty., Eugene, Or., for plaintiff-appellee.

Shaun S. McCrea, Eugene, Or., for defendant-appellant.

Before ALARCON, REINHARDT and THOMPSON, Circuit Judges.

THOMPSON, Circuit Judge:

James Douglas McQuisten appeals his jury trial convictions for violations of federal narcotics laws arising out of a conspiracy to manufacture and distribute methamphetamine, the manufacture of P–2–P, and related offenses. On appeal he contends (1) the affidavit in support of a search warrant for his residence fails to establish probable cause for the issuance of the warrant; (2) the affidavit for the search warrant contains materially false statements and omissions; (3) the district court abused its discretion by allowing the government to reopen its case after the defense rested; (4) the district court abused its discretion by admitting into evidence a photograph of him without proper foundation and when the identification of the person in the photograph was unreliable, and (5) the district court improperly sentenced him for both the conspiracy and attempt convictions under 21 U.S.C. § 846. We affirm.

## FACTS

Investigation into this case began in January 1984, when DEA agents received information from a confidential informant that a methamphetamine lab was being operated in the area of Grants Pass, Oregon.

The FBI and the local sheriff's office also had information from a confidential informant that McQuisten was controlling and operating a methamphetamine lab in the area. McQuisten was present at a home in Lake Tahoe in May 1984, when a federal search warrant in an unrelated case was executed and a pound of methamphetamine was seized. McQuisten gave his home address as 1445 S.E. "N" Street, Grants Pass, Oregon to officers executing the Lake Tahoe search warrant.

On July 30, 1984, an employee of the All World Chemical Supply Company (AWCS) told DEA agents that a person named "Joe Wilson" ordered two hundred pounds of phenylacetic acid, a precursor commonly utilized in the manufacture of methamphetamine, for the Sandel Corporation, 1445 S.W. "A" Street, Portland, Oregon. A check of state records revealed that no such corporation or address existed. On August 14, 1984, McQuisten and co-defendant Ducat picked up the two hundred pounds of phenylacetic acid from AWCS. At the time, they were driving a car owned by Joseph Orrio. Agents had information from a confidential informant that Orrio was involved in the operation of a methamphetamine lab in the Grants Pass area. McQuisten and Ducat were followed to a phone booth where, as agents later learned, they used the name Joe Wilson to place an order with AWCS for twenty bottles of methylamine, also a precursor used in conjunction with phenylacetic acid to manufacture P-2-P and methamphetamine. McQuisten and Ducat were then followed back to AWCS where they placed a $500 deposit on the methylamine. The chemical was later delivered to Ducat.

Over the next several weeks McQuisten and others were frequently seen picking up chemicals and supplies from AWCS and the Nurnberg Scientific Shop. Surveillance of McQuisten's home revealed that he was frequently visited by Orrio and Gerald Kringen. Kringen had been indicted in February and August 1984 for possession of methamphetamine. Automobiles owned by co-defendant Donald Saviers were also seen at McQuisten's residence.

On October 24th, McQuisten was seen at Nurnberg's picking up supplies including six pounds of hydrochloric acid, forty feet of vacuum tubing, PH paper, and thermometers. These supplies, also used in the manufacture of methamphetamine, were loaded in McQuisten's truck, which was then driven to his residence where it remained overnight.

One week later, McQuisten purchased 100 kilograms of phenylacetic acid from AWCS. He identified himself to the store clerk as John McQuisten, representing Fertilizers Manufacturing, Inc. (Employees of AWCS were shown a photograph of McQuisten and they identified him as the purchaser of the chemical.)

In early November, agents learned that McQuisten rented a storage unit at the Foothill Mini Storage. The manager told the agents McQuisten had requested a unit large enough to hold his truck because he did not want to have to unload it. While standing in front of the storage unit, agents detected an odor similar to that produced by methamphetamine labs and suspected that a dismanteled methamphetamine lab was being stored inside. The agents then obtained a court order to install an electronic beeper in the truck in the storage facility. An alarm system was also installed in the storage unit to alert agents when the door to the unit was opened. In late November, agents followed McQuisten as he drove from the storage unit to property at 225 Greenleaf Way, owned by Harvey and Dolores Saviers and where "D.C. Saviers" had his telephone listed. The truck was unloaded the next day in a shed located on the Greenleaf Way property. During the next few days, McQuisten was frequently seen at the shed. On November 24th, search warrants were executed at the Greenleaf Way property and at McQuisten's residence. A fully operational methamphetamine lab was found in the shed at the Greenleaf Way property. At least one batch of methamphetamine and P-2-P had been manufactured and another quantity of methamphet-

amine was being produced when the search warrant was executed. The search of McQuisten's residence yielded a receipt from the Nurnburg Scientific Shop for lab equipment purchased in October, 1984 and a match cover with the names "All World," "Joe Wilson," and "Sandel" written on it.

McQuisten was indicted along with Donald and Daniel Saviers and Kenneth and Blaine Ducat. At the time of trial, after the jury had been empaneled and following opening statements, co-defendants Donald Saviers and the Ducats pleaded guilty to a conspiracy count. Daniel Saviers pleaded guilty to one count of attempt to manufacture methamphetamine, and the trial proceeded with McQuisten as the sole remaining defendant.

McQuisten was found guilty of all charges. He was convicted of conspiracy to manufacture methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1) and 846; manufacturing methamphetamine in violation of 21 U.S.C. §§ 841(a)(1) and 18 U.S.C. § 2; attempting to manufacture methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1) and 846 and 18 U.S.C. § 2; possession with intent to distribute methamphetamine, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2; manufacturing P–2–P, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2; and interstate travel to promote the sale of methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1) and 18 U.S.C. § 1952. He was sentenced to five concurrent fifteen-year terms on each of the five drug counts, a concurrent five-year term on the interstate travel count, and a five-year special parole term.

## DISCUSSION

### I. *Search Warrant*

#### A. *Probable Cause*

McQuisten contends the evidence seized at his residence pursuant to the search warrant should have been suppressed. He challenges the magistrate's determination that the affidavit in support of the search warrant established probable cause for the search. He argues the affidavit failed to show connection between his home and any criminal activity.

The affidavit at issue was prepared by DEA Agent Richard Wisenor. Wisenor also incorporated by reference two other affidavits: his affidavit used to obtain the court order to place the electronic beeper in McQuisten's truck and his affidavit used to obtain the search warrant for the Saviers's residence on Greenleaf Way.

A magistrate's determination of probable cause to issue a warrant is treated with great deference and is not reviewed de novo. *United States v. Alexander*, 761 F.2d 1294, 1300 (9th Cir.1985). We may not reverse a magistrate's finding of probable cause unless it is clearly erroneous. *United States v. Stanert*, 762 F.2d 775, 779, *amended and reh'g. denied*, 769 F.2d 1410 (9th Cir.1985). We need only find that under the totality of the circumstances the magistrate had a substantial basis for concluding that probable cause existed. *United States v. Dicesare*, 765 F.2d 890, 896, *amended*, 777 F.2d 543 (9th Cir.1985). In doubtful cases, preference should be given to the validity of the warrant. *United States v. Peacock*, 761 F.2d 1313, 1315 (9th Cir.), *cert. denied*, — U.S. ——, 106 S.Ct. 139, 88 L.Ed.2d 114 (1985).

The standard to be used by a magistrate in evaluating whether probable cause has been shown for the issuance of a search warrant was recently restated by the Supreme Court in *New York v. P.J. Video, Inc.*, — U.S. ——, 106 S.Ct. 1610, 89 L.Ed.2d 871 (1986). There the Court stated:

The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, ... there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of a reviewing court is simply to ensure that the magistrate had a 'substantial basis for ... conclud[ing,]' [*Jones v. United States*, 362 U.S. 257,

271 [, 80 S.Ct. 725, 736, 4 L.Ed.2d 697] (1960),] that probable cause existed.

*P.J. Video, Inc.*, 106 S.Ct. at 1615–16 (*quoting Illinois v. Gates*, 462 U.S. 213, 238–39, 103 S.Ct. 2317, 2332–33, 76 L.Ed.2d 527 (1983)).

█ We conclude the magistrate's finding of probable cause was not clearly erroneous. He had a substantial basis for concluding that probable cause existed. The affidavit in support of the search warrant established that McQuisten was known to DEA agents as a manufacturer and supplier of methamphetamine. He had been seen several times picking up chemicals and supplies used in the manufacture of methamphetamine. Vehicles registered to a co-defendant had been seen at McQuisten's home on several occasions and McQuisten's truck containing chemicals and supplies had been seen parked in the driveway of his home. McQuisten had been visited frequently at his home by a person suspected of manufacturing methamphetamine and by another who was under indictment for possession of methamphetamine.

In addition to the foregoing, the affidavit also reflected the significant similarity between McQuisten's address (1445 S.E. "N" Street) and the address given for the fictitious Sandel Corporation (1445 S.W. "A" Street). The search warrant sought ledgers, receipts, and order forms. These items constitute the kind of documents one would expect to find at the address of a buyer of precursor materials used in the manufacture of methamphetamine. The affidavit established that McQuisten had been seen purchasing precursor materials for the Sandel Corporation and that agents had verified that the corporation and its address were nonexistent. Under these circumstances, it was reasonable to conclude that McQuisten's residence and the location of the fictitious Sandel Corporation were one and the same, and it was reasonable to infer that evidence of the acquisition of materials to be used in the manufacture of methamphetamine, which the Sandel Corporation had purchased through McQuisten, would be found at McQuisten's home. *See Peacock*, 761 F.2d at 1315 (magistrate need only conclude that it would be reasonable to seek evidence at the place to be searched); *United States v. Dubrofsky*, 581 F.2d 208, 213 (9th Cir.1978) ("a warrant may be upheld when the nexus between the items to be seized and the place to be searched rests not upon direct observation, but upon the type of crime, nature of the items, and normal inferences where a criminal would likely hide contraband.") (citation omitted).

## B. *Misstatements and Omissions in the Affidavit*

Prior to trial, McQuisten moved for an evidentiary hearing pursuant to *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). He argued that certain statements in the affidavit in support of the search warrant prepared by Agent Wisenor were materially false and misleading, and that there were material omissions from the affidavit that influenced the magistrate's finding of probable cause. In support of the motion, defense counsel attached an affidavit in which she pointed out discrepancies between Agent Wisenor's affidavit and affidavits and reports prepared by other agents. The magistrate found that most of the alleged false statements were irrelevant to the issue of probable cause and that the alleged omissions, if present, would have strengthened probable cause for issuance of the warrant. The magistrate also found that the evidence did not indicate any of the alleged false statements or omissions had been made intentionally or recklessly. The magistrate thus concluded that McQuisten had not met the requirements necessary for a *Franks* hearing and recommended that McQuisten not be granted an evidentiary hearing. McQuisten filed objections to the magistrate's finding, after which the district court granted him a hearing.[1] Following

---

**1.** It is unclear from the record whether this was a *Franks* hearing, even though testimony was taken from the agents who prepared the affidavits. The district court found that McQuisten

the hearing, the district court found the evidence did not support a finding that materially false statements or omissions had been made in the affidavit. We agree.

■ The underlying factual findings of the district court are reviewed under the clearly erroneous standard. *United States v. Ippolito*, 774 F.2d at 1482, 1484 (9th Cir.1985). The ultimate question, whether misstatements and omissions are material to a finding of probable cause is a mixed question of law and fact subject to de novo review. *Id.*

■ McQuisten argues that three statements in the affidavit involving identification of himself as the person seen picking up chemicals at AWCS are false. A review of the transcript of the hearing conducted by the district court, however, provides no evidence to support that contention. McQuisten also points to three omissions which he contends were material to the finding of probable cause. These omissions involve identification of photographs of McQuisten and a description of his truck as well as an inference in the affidavit that McQuisten had attempted to elude surveillance when in fact he was lost. These omissions were not material to a finding of probable cause. Moreover, the transcript of the hearing conducted by the district court contains no evidence that the alleged misstatements or the omissions were deliberate or resulted from a reckless disregard for the truth. *See Stanert*, 762 F.2d at 780.

## II. *Reopening of Government's Case*

McQuisten contends he was prejudiced when the court allowed the government to reopen its case after the defense had rested without calling any witnesses. He argues that he intentionally did not produce any evidence in reliance upon his understanding that the government had rested its case. He contends that evidence offered by the government the next day when it was allowed to reopen permitted the government to "bolster its case" with additional evidence, and that he was prejudiced because the government then had the advantage of presenting evidence one more time before the case was argued. We find these arguments unpersuasive.

■ The district court's decision to allow a party to reopen its case is reviewed for an abuse of discretion. *United States v. Huber*, 772 F.2d 585, 592 (9th Cir.1985).

During its case-in-chief, the government called as a witness Don Jauchius, an employee of the Nurnberg Scientific Shop where McQuisten had purchased supplies in October 1984. Jauchius was shown a photograph of McQuisten and testified in response to questioning by the government:

Q. I would like to next show you a photograph that has been marked 2–H. If you could look at that, have you ever seen the gentleman depicted in that photograph before?

A. That resembles the person that picked up the materials in the truck to the best of my memory.

Q. Have you ever seen that person before in your shop? Your Nurnburg Scientific Shop?

A. I am not sure.

The government did not offer any testimony that the photograph shown to Jauchius was a picture of McQuisten, nor did it offer the picture into evidence at that time. It was shortly thereafter that the government rested its case for the first time, subject to verifying that all of its exhibits

had not made a "sufficient preliminary showing to trigger [a] *Franks v. Delaware* evidentiary hearing." However, the court then stated that "[e]ven assuming the material presented was presented in connection with the *Franks* hearing," the evidence would not support a finding that material misstatements or omissions had been made in the affidavit. McQuisten does not contend he was improperly denied a hearing, so

we assume the hearing conducted by the district court was a *Franks* hearing. In so doing, we express no opinion as to whether McQuisten made a sufficient preliminary showing to entitle him to a hearing. *See United States v. Stanert*, 762 F.2d 775, 780, *amended and reh'g denied*, 769 F.2d 1410 (9th Cir.1985) (setting forth requirements for *Franks* hearing).

had been offered and received into evidence. The next morning the defense rested without calling any witnesses. The government then moved to reopen its case to offer into evidence the photograph of McQuisten that had been shown to Jauchius. The government also sought to introduce photographs of McQuisten's truck that had been shown to other witnesses and to elicit testimony from a DEA agent that an address used by McQuisten was fictitious. McQuisten offered no objection to the pictures of the truck being received. He did, however, object to the admission into evidence of the photograph of himself and to the court receiving the testimony of the agent on the ground he would be prejudiced because the jury would hear from the government one more time before closing. His objections were overruled, the government was allowed to reopen, and the photographs of the truck were admitted into evidence. The parties then stipulated that the photograph shown to Jauchius was of McQuisten and that photograph was admitted into evidence. The parties also stipulated to the agent's testimony regarding the fictitious address. McQuisten preserved his objections to the admission of the photograph and to the testimony.

■ The testimony of the DEA agent as to McQuisten's use of a fictitious address was cumulative and added little to the government's already strong case. The court did not abuse its discretion in permitting the government to reopen to present that evidence.

■ Regarding the photograph of McQuisten, appellant argues the government should not have been permitted to reopen its case to offer the photograph into evidence because Jauchius, the store employee who testified the previous day that the person in the photograph resembled the person who came into the supply store, was no longer present and available for cross-examination. McQuisten contends he did not cross-examine Jauchius when he testified earlier concerning the photograph because the photograph was not offered into evidence at that time. This argument overlooks the fact, however, that when McQuisten objected to the government reopening its case he did not request a continuance to have Jauchius brought back for cross-examination. Under these circumstances he has not demonstrated that the trial court abused its discretion when it allowed the government to reopen its case. *See Huber,* 772 F.2d at 592 (9th Cir.1985).

### III. *Admissibility of Photograph*

McQuisten next contends the district court should not have admitted the photograph of him into evidence because there had not been a proper foundation laid for its admission. He also contends that the witness Jauchius's identification of him in the photograph was not reliable. We review the district court's admission of the photograph into evidence for an abuse of discretion. *United States v. Brannon,* 616 F.2d 413, 418 (9th Cir.), *cert. denied sub nom. Cox v. United States,* 447 U.S. 908, 100 S.Ct. 2993, 64 L.Ed.2d 858 (1980).

### A. *Foundation*

■ McQuisten's argument that the court should have rejected the photograph for lack of a proper foundation is without merit. The defense did not contend the photograph was not of McQuisten, and after the government was permitted to reopen its case, the defense stipulated the person in the photograph was McQuisten. Jauchius testified that the person in the photograph resembled the person who purchased supplies from his store. Earlier testimony established McQuisten was that person.

### B. *Reliability of Identification*

McQuisten also argues the district court erred in admitting the photograph of him into evidence because Jauchius's testimony that the person in the photograph "resemble[d] the person that picked up the materials in the truck to the best of my memory" amounted to an unreliable identification of McQuisten which the district court should have rejected by applying the factors set forth in *Neil v. Biggers,* 409 U.S. 188, 93

S.Ct. 375, 34 L.Ed.2d 401 (1972).[2] Jauchius did not identify McQuisten in court as the person who came to the store to pick up the materials, but he did identify the individual in the photograph as resembling that person.

■ McQuisten did not object at trial to the admission of the photograph into evidence on the ground that Jauchius's identification testimony concerning the person in the photograph was unreliable. He seeks to raise that objection for the first time on appeal. Not having made that objection in the trial court, he has waived it. Fed.R. Evid. 103(a)(1). Moreover, here the photograph was shown to Jauchius and his identification testimony concerning it occurred in court. The issue McQuisten seeks to raise is similar to that raised in *United States v. Domina,* 784 F.2d 1361 (9th Cir. 1986). In *Domina,* the identification of the defendant occurred in court. There had been no pre-trial identification procedures conducted by the police or the prosecution. It was argued that to permit an in-court identification of the defendant for the first time with his presence obvious to the witnesses would be unduly suggestive. *Id.* at 1367. We held there is no constitutional requirement that the same standards set forth in *Neil* be applied to an initial in-court identification of a defendant. *Id.* at 1368–69. We reasoned that when the initial identification is made in court, the trier of fact "can observe the witness during the identification process and is able to evaluate the reliability of the initial identification." *Id.* at 1368.

Here, the witness Jauchius had earlier made an out-of-court identification of McQuisten, from a photograph, as the person who had purchased chemicals from his store. However, in court he made no identification of the defendant, nor did he identify McQuisten as the person in the photograph he was shown. Jauchius was only able to testify that the individual in the

photograph resembled a person who came to pick up materials at the store. McQuisten could have sought to combat this testimony by cross-examining Jauchius at the time he testified, but he chose not to do so. He could also have addressed Jauchius's testimony in argument to the jury. *See Domina* 784 F.2d at 1369. Further, as in *Domina,* this is not a case "where the question of guilt or innocence hangs entirely on the reliability and accuracy of the in-court identification...." *Id.* at 1369 (*quoting United States v. Williams,* 436 F.2d 1166, 1168 (9th Cir.1970), *cert. denied,* 402 U.S. 912, 91 S.Ct. 1392, 28 L.Ed.2d 654 (1971).

## IV. *Multiple Sentences*

■ Among other counts, McQuisten was convicted of conspiracy to manufacture methamphetamine and attempt to manufacture methamphetamine, both in violation of 21 U.S.C. §§ 846 and 841(a)(1). The district court sentenced him to a fifteen-year term for the conspiracy conviction and a separate fifteen-year concurrent term for the attempt conviction. McQuisten argues it was error for the court to impose these multiple sentences. We disagree, and conclude McQuisten was properly sentenced for both his conspiracy and attempt convictions.

Title 21 U.S.C. § 846 provides:

Any person who attempts or conspires to commit any offense defined in this subchapter is punishable by imprisonment or fine or both which may not exceed the maximum punishment prescribed for the offense, the commission of which was the object of the attempt or the conspiracy.

Title 21 U.S.C. § 841(a)(1) makes it unlawful to knowingly or intentionally manufacture a controlled substance. Methamphetamine is a controlled substance within

---

2. Factors to be considered under *Neil* in evaluating the likelihood of misidentification include (1) the opportunity of the witness to view the defendant at the time of the crime, (2) the witness's degree of attention, (3) the accuracy of the witness's prior description of the defendant, (4) the level of certainty demonstrated by the witness at the time of identification, and (5) the length of time between the crime and the identification. *Neil,* 409 U.S. at 199, 93 S.Ct. at 382.

the meaning of section 841(a)(1). 21 U.S.C. § 812.

We first addressed the issue of multiple sentences for violations of section 846 in *United States v. Taylor*, 716 F.2d 701 (9th Cir.1983). There, Taylor and a co-defendant, Pressler, were convicted of conspiracy to manufacture amphetamines and attempt to manufacture amphetamines in violation of 21 U.S.C. § 846. They received separate sentences for each conviction. The government alleged Taylor was operating or had attempted to operate an amphetamine lab at his home. Pressler's role was to pick up previously ordered chemicals at a chemical supply store. A beeper was placed in one of the chemical boxes which was eventually moved to Taylor's home. A search warrant was obtained and executed and both Taylor and Pressler were arrested. At the time of the searches, DEA agents did not find a working laboratory or any manufactured amphetamines. *Id.* at 705. We concluded that the court had erroneously instructed the jury on the attempt counts and reversed the attempt convictions. *Id.* at 711–12. In a footnote we expressed concern about "an ambiguity" in 21 U.S.C. § 846 because the statute seemed to create only a single offense "denominated 'attempt or conspiracy.'" *Id.* at 712 n. 6. We recognized that in some circumstances Congress may have intended separate punishments for both conspiracy and attempt under section 846, and we theorized that a conspiracy to manufacture amphetamines followed by a. later separate attempt to manufacture amphetamines could constitute separate punishable offenses. *Id.; see also id.* at 713 (Fletcher, J., concurring).

The question of the validity of multiple sentences for convictions of both conspiracy and attempt under 21 U.S.C. § 846 did not come before us, however, until *United States v. Touw*, 769 F.2d 571 (9th Cir.1985). Between *Taylor* and *Touw*, we decided *United States v. Palafox*, 764 F.2d 558 (9th Cir.1985) (en banc). There, the defendant was convicted of one count of distribution of heroin (a sample) and possession with intent to distribute heroin (the balance to be sold) both in violation of 21 U.S.C.

§ 841(a)(1). Palafox met an undercover agent in a parking lot intending to sell him a package of heroin. The agent took a .12 gram sample of the drug from the package and returned the package to Palafox. Almost immediately thereafter the agent arrested Palafox who was charged and convicted both of the delivery of the sample and possession with intent to distribute the rest of the heroin in the package. In an en banc decision we held that "where the defendant distributes a sample and retains the remainder for the purpose of making an immediate distribution to the same recipient at the same place and at the same time, verdicts of guilty may be returned on both counts but the defendant may be punished on only one." *Id.* at 560. Although we recognized Congress's interest in criminalizing all aspects of drug trafficking, we found no congressional intent to punish a defendant more than once for a single transaction. *Id.* at 560–62. We distinguished *United States v. Mehrmanesh*, 682 F.2d 1303 (9th Cir.1982) in which we upheld multiple sentences under 21 U.S.C. § 841(a)(1) where there had been an initial delivery of a sample and a second delivery of the remainder of the bulk several hours later to a different person at a different place. *Palafox*, 764 F.2d at 559.

In *United States v. Rodriguez-Ramirez*, 777 F.2d 454 (9th Cir.1985), we upheld a district court's imposition of separate, concurrent sentences for distribution of a sample and possession with intent to distribute the remainder. In *Rodriguez*, the defendant acted alone in transporting heroin samples to a meeting with undercover agents on October 5th. The samples were given to the agents and a second meeting was arranged for October 7th. On October 7th, the defendant, Rodriguez, and his co-defendant, Aispuro, both participated in transporting the remaining quantity of heroin to a parking lot where the deal was to take place. While Rodriguez drove into the parking lot with the heroin, Aispuro parked outside at a vantage point from which he could watch the transaction. *Id.* at 456. In upholding the imposition of separate

sentences we distinguished *Palafox* on the ground that it involved distribution of a sample and possession of the remainder " 'at the same time, in the same place and with the involvement of the same participants,' " *id.* at 457–58 (*quoting Palafox*, 764 F.2d at 563), and *Rodriguez* did not. *Id.*

Four months before *Rodriguez* was decided, we issued our opinion in *Touw*, 769 F.2d 571 which involved not delivery of a sample of a controlled substance coupled with possession of the remainder, but conspiracy to possess and attempted possession with intent to distribute a controlled substance in violation of 21 U.S.C. § 846. There, as early as August 1983, Touw and Farley (who was not indicted) met with DEA agents and attempted to buy five pounds of marijuana. The DEA agents declined to make a sale because the quantity requested was too small. Between March and June of 1984, there were numerous telephone calls between Touw and government agents concerning the purchase of marijuana. In May 1984, Touw and one of the co-defendants, Anderson, met with DEA agents and were shown about 1,000 pounds of marijuana, but no sale took place. In June 1984, Touw, Anderson, and another co-defendant, Kocks, met with DEA agents and upon being shown 300 pounds of marijuana, they produced $117,000 to buy it. At that point they were arrested. All three defendants were convicted of conspiracy to possess marijuana and attempted possession of marijuana with intent to distribute in violation of 21 U.S.C. §§ 846 and 841(a)(1). They received separate, consecutive sentences for the conspiracy and attempt convictions. We reversed the imposition of multiple sentences, and held that only one sentence could be imposed for both the conspiracy and the attempt counts because

the defendants "engaged in a single act when they attempted to purchase marijuana from DEA agents[,]" *id.* at 574, and that while "[t]he government properly charged them with both conspiracy and attempt, ... if convicted on both counts, the court may punish them only on one count." [3] *Id.*

Following *Touw* and *Rodriguez*, we decided *U.S. v. Wilson*, 781 F.2d 1438 (9th Cir.1986) (per curiam). In *Wilson*, the defendant was convicted of possession of piperidine with knowledge that it would be used to manufacture PCP (21 U.S.C. § 841(d)(2)); manufacturing PCC (21 U.S.C. § 841(a)(1)), and attempting to manufacture PCP (21 U.S.C. §§ 841(a)(1) and 846). We concluded that the possession of piperidine and the manufacture of PCC were only successive steps in one criminal undertaking, that being the attempted manufacture of PCP. We held that while the defendant could properly be charged and tried on separate counts for each step in the process (possession, manufacturing PCC, and the attempt to manufacture PCP), he could be convicted and sentenced on only one count. We relied on our holding in *Palafox* that "[w]here Congress creates different crimes aimed at successive stages of a single criminal undertaking, the defendant can properly be charged and found guilty of multiple offenses, but may be punished only for the commission of one offense." *Id.* at 1439. We also relied upon *Prince v. United States*, 352 U.S. 322, 77 S.Ct. 403, 1 L.Ed.2d 370 (1957) which we noted "held that although Congress had criminalized both the entering of a bank with intent to rob it and the robbery itself, it did not intend to multiply the punishments." *Wilson*, 781 F.2d at 1439.

With this background in mind, we now turn to the circumstances of the case be-

---

**3.** At least three other circuits addressing this issue have reached a different conclusion when the two crimes in question are conspiracy and attempt. In *United States v. Calabrese*, 755 F.2d 302, 305 (2nd Cir.1985) the court stated that the district court could sentence the defendant for up to fifteen years on each count of conspiracy and attempt under section 846. In *United States*

*v. Anderson*, 651 F.2d 375, 379 (5th Cir.1981), the court held that under 21 U.S.C. § 963, which is identical in language to section 846, consecutive sentences could be imposed for conspiracy to import and attempt to import narcotics. *Anderson* was followed by the Eleventh Circuit in *United States v. Alonso*, 673 F.2d 334, 337 (11th Cir.1982).

fore us. Here we do not have one transaction occurring at the same place and time and between the same participants as in *Palafox.* Nor do we have merely successive steps in one criminal undertaking as in *Wilson.* Rather, we have several distinct criminal acts. First there was the conspiracy. That was followed by a number of separate transactions and events involving different people at various locations over a period of months. Then came the actual completed manufacture of quantities of methamphetamine and P–2–P followed by an attempt to manufacture yet another batch of methamphetamine. The case thus fits within the suggestion we made in *Taylor* that a conspiracy followed by a later separate attempt could constitute separate punishable offenses, *Taylor,* 716 F.2d at 712 n. 6; *see also id.* at 713 (Fletcher, J. concurring), and is distinguishable from *Touw* in which we found that the defendants were engaged in a single act when they attempted to purchase marijuana from the DEA agents. The separate character of the attempt count in this case is further demonstrated by the fact that McQuisten and his co-defendants actually succeeded in making one batch of methamphetamine and another of P–2–P. A second batch of methamphetamine was in the process of being manufactured when the search warrant was executed and it was the attempt to manufacture a second quantity of methamphetamine that formed the basis for the attempt conviction (*compare Taylor,* 716 F.2d at 705, where agents failed to find any amphetamines or a working laboratory).

Our conclusion that McQuisten could be sentenced for both conspiracy and attempt is supported by the legislative history of section 846. The percursor of the conspiracy portion of section 846 was first enacted by Congress in 1951 as an amendment to the Narcotics Drugs Import and Export Act, 26 U.S.C. § 2557(b)(1) (1952). This amendment made conspiracies to violate substantive provisions of the narcotics law "specific offenses" with separate penalties. *United States v. Bey,* 736 F.2d 891, 893–94 (3rd Cir.1984). In contrast, prior to the passage of section 846, an attempt to commit a substantive drug offense was not punishable under federal narcotics laws. *Bifulco v. United States,* 447 U.S. 381, 399, 100 S.Ct. 2247, 2258, 65 L.Ed.2d 205 (1980). When Congress enacted section 846, it dealt with both conspiracy and attempt in a single provision, *id.,* and prescribed identical penalties for both crimes. *United States v. Bogart,* 783 F.2d 1428, 1439 (9th Cir.1986).

The inclusion of attempt in section 846 evidences "the strong congressional intent to criminalize all aspects of drug trafficking," *Palafox,* 764 F.2d at 560; *see also Touw,* 769 F.2d at 574, rather than indicating that Congress intended to establish only one crime called "conspiracy or attempt." Therefore, multiple punishments under section 846 are appropriate when "the defendant 'attempts or conspires' to violate the drug laws on two or more separate occasions." *Taylor,* 716 F.2d at 713 (Fletcher, J. concurring).

We thus conclude that the imposition of multiple sentences for convictions of both conspiracy and attempt under section 846 was proper.

AFFIRMED.

REINHARDT, Circuit Judge, dissenting:

James Douglas McQuisten was found guilty of, *inter alia,* violating 21 U.S.C. § 846, for both conspiring to and attempting to manufacture methamphetamine, a controlled substance within the meaning of 21 U.S.C. § 841(a)(1). The majority affirms the district court's imposition of separate, but concurrent, fifteen year prison terms for each. Because the majority opinion is not consistent with either congressional intent or prior decisions of this circuit, I dissent.

Title 21 U.S.C. § 846 (1981) provides that: Any person who attempts or conspires to commit any offense defined in this subchapter is punishable by imprisonment or fine or both which may not exceed the maximum punishment prescribed for the offense, the commission of which was the object of the attempt or conspiracy.

We have previously noted that this section is ambiguous in that the "statute seems to create only a single offense, denominated 'attempt or conspiracy.'" *United States v. Taylor*, 716 F.2d 701, 712 n. 6 (9th Cir. 1983). This ambiguity is clarified somewhat by examining the legislative history of the Comprehensive Drug Abuse Prevention and Control Act of 1970, Pub.L. 91–513, 84 Stat. 1242 (codified as amended in scattered sections of 21 U.S.C.).

According to President Nixon in his message accompanying the legislation in 1969, the purpose of the Act was to respond to the drug problem with a "concerted national policy." *Combatting Drug Abuse*, H.R. Doc. No. 138, 91st Cong., 1st Sess. (July 14, 1969). As Attorney General Mitchell testified to the House Committee on Ways and Means, the "major law enforcement effort against the street pusher and the middleman had been left to the jurisdiction of the State and local governments." *Controlled Dangerous Substances, Narcotics and Drug Control Laws: Hearings Before the Committee on Ways and Means*, 91st Cong., 2d Sess. 234 (1970). This concerted national policy attempted to create a uniform system of national enforcement by expanding the coverage or scope of the federal narcotics laws and encompassing the multiple strands of federal laws and regulations governing controlled substances in one Act.

At the time the Act was adopted, conspiracies to sell or import controlled substances were federal offenses, although "[a]ttempts to commit an offense [were] not punishable under current law." Section-By-Section Analysis of H.R. 17463, *Ways and Means Hearings* 223 (prepared by John E. Ingersoll, Director, Bureau of Narcotics and Dangerous Drugs). While there was federal law governing conspiracies for the sale or illicit manufacture of controlled substances, attempts were punishable only under state law and hence the treatment of attempts varied substantially from state to state.

Congress' intent in enacting § 846 would seem to have been to close the loophole regarding "attempts" in our national drug enforcement statutes as part of its comprehensive effort to render all aspects of drug trafficking contrary to federal law. Thus, Congress made attempts "punishable" in order to promote uniformity and to improve the effectiveness of law enforcement. In other words, the purpose of the statute was to ensure that a person attempting to commit a narcotics offense would not escape punishment entirely simply because the attempt was aborted; the purpose was *not* to provide for multiple punishment when a conspiracy and an attempt occured simultaneously. The placement of both conspiracy and attempt together in one provision supports the conclusion expressed above. The statutory framework indicates strongly that Congress' primary concern was ensuring that all persons who commit criminal acts in the narcotics area would be punished, even if their acts fell short of constituting substantive offenses.

If a conspiracy ends and an attempt occurs subsequently, each is punishable under § 846. As the Supreme Court has stated, section 846 prescribes "an identical range of punishment for a person convicted of participation in a major trafficking conspiracy, and for another person convicted of an unsuccessful attempt to manufacture or distribute a small amount of a controlled substance." *Bifulco v. United States*, 447 U.S. 381, 399, 100 S.Ct. 2247, 2258, 65 L.Ed.2d 205 (1980). Here, however, as was the case in *United States v. Touw*, 769 F.2d 571 (9th Cir.1985), the defendant's *attempt* to commit a narcotics offense constituted a part of a conspiracy in which he was then engaged.

Our prior decisions have established the rule that if a defendant engages in a single course of action, *punishment* for both conspiracy and attempt under § 846 is inappropriate, although convictions of both conspiracy and attempt are permissible. *See Touw*, 769 F.2d at 574; *United States v. Taylor*, 716 F.2d at 712 n. 6. In *Touw*, appellants both conspired to and attempted to purchase marijuana from Drug Enforcement Administration (DEA) agents. When

Touw and his co-defendants produced $117,000 to purchase 300 pounds of marijuana, all were arrested by DEA agents. This arrest occurred after almost a year of contact between Touw and the undercover DEA agents. The conspiracy in *Touw* continued over a substantial period and the attempt was committed within the time and scope of the conspiracy. We held that the defendants had been properly charged with both counts even though the defendants had engaged in a single course of conduct. Nevertheless, reviewing the case law in our circuit, we noted that "we found no Congressional intent to punish the defendant more than once for the same criminal undertaking." *Id.* at 574 (citing *United States v. Palafox*, 764 F.2d 558, 562 (9th Cir.1985) (en banc)). Similarly, Judge Fletcher noted in *United States v. Taylor* that "a defendant may not be punished for *both* attempt and conspiracy based upon a single course of conduct merely because the elements of both offenses are present." 716 F.2d at 713 (emphasis in original) (concurring opinion). *See also* 716 F.2d at 712 n. 6 (majority opinion).

Part of the reason underlying the rule we have heretofore followed in this circuit is the fact that a conspiracy frequently, if not almost necessarily, involves an attempt. In order to prove the existence of a conspiracy, some overt act by the defendant in furtherance of the objective of the conspiracy is required. The difference between an overt act evidencing that a conspiracy has been implemented in part and an act sufficient to constitute an attempt is one of degree only. On the other hand, the line between a conspiracy and the commission of the substantive offense is clear. *Accord United States v. Washington Water Power Co.*, 793 F.2d 1079 (9th Cir.1986). Multiple punishment of the overt act/attempt and conspiracy is unnecessary to effectuate Congress' desire to punish violators of § 846.

As we noted in *Taylor*, a case of the type before us is "suitable for application of the doctrine of lenity." 716 F.2d at 712 n. 6. The doctrine constitutes a rule of statutory construction that guides courts in the inter-

pretation of both the "substantive ambit of criminal prohibitions [and] also [ ] the penalties they impose." It provides that a court should resolve doubts in favor of the criminal defendant. *Bifulco*, 447 U.S. at 387, 100 S.Ct. at 2252. As Justice Rehnquist stated in *Albernaz v. United States*, lenity is "an aid for resolving ambiguity." 450 U.S. 333, 342, 101 S.Ct. 1137, 1143, 67 L.Ed.2d 275 (1981). Here we unquestionably are faced with an ambiguous statutory provision. In cases involving one course of conduct violative of the "attempt or conspire" provision of § 846, the rule of lenity is applicable and the defendant should not be subjected to multiple punishment.

I would remand for resentencing.